Argued and submitted August 9, affirmed October 2, 2019

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL SHANE CHASTAIN,
*Defendant-Appellant.*

Lane County Circuit Court
17CR16892; A166644

451 P3d 646

Defendant pleaded guilty to first-degree theft after police found parts of a custom-built motorcycle on his property. Defendant objected to the state's request of $82,000 in restitution to the victim for the stolen motorcycle. In defendant's view, the value of the motorcycle was limited to the amount that the victim's insurer paid to the victim, $26,758. Because the motorcycle was a one-of-a-kind showpiece with no readily available market to establish its reasonable market value, the trial court measured the cost of the parts and the labor used to construct the motorcycle as the reasonable market value. In a supplemental judgment, the trial court ordered restitution in the amount of $82,000. Defendant appeals. *Held*: The trial court did not err. Evidence in the record supported the trial court's finding that there is no market for the custom-built motorcycle. Because no comparable sales or market price existed, the trial court appropriately considered replacement costs to determine market value.

Affirmed.

Charles M. Zennaché, Judge.

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and Powers, Judge, and Kistler, Senior Judge.

KISTLER, S. J.

Affirmed.

**KISTLER, S. J.**

Defendant appeals from a supplemental judgment of restitution entered after he pled guilty to, among other things, first-degree theft. He argues that the trial court erred in awarding the victim $82,000 in restitution for the stolen property. We affirm the trial court's judgment.

The victim owned a custom-built, three-wheeled motorcycle (the "Trike"),[1] which he designed with the help of other machinists over a period of years. Everything on the Trike "had to be custom built except the engine, and even the engine had to be modified." The victim testified that the parts used to construct the Trike cost "between 60 and 70,000," dollars[2] and he submitted receipts in support of his testimony. He testified that he had paid two other persons to help him build the Trike, and he estimated that the total cost of the parts and labor were "close to 100,000" dollars. The Trike was primarily a show piece, which the victim transported from one show to another in a trailer. The Trike had been driven only six or seven thousand miles since the victim first registered it in 2002.

In 2017, the victim took the Trike to a shop to upgrade the front end. While it was in the shop, a person named Rentfrow stole it. Rentfrow sold the Trike for a minimal amount to defendant, who cut it up for parts.[3] When the police recovered what was left of the Trike, they were able to salvage some of the parts, which the insurance company valued at approximately $8,000. The insurance company paid the victim $26,758 for the Trike, after deducting $8,000 for the recovered parts. In discussing the payment from the insurance company, the victim testified that he and the company had gone "back and forth, and they said, 'Well, it's difficult [to value the Trike] because it's not just a one model car you can get, and you have a price [for that car],

---

[1] A picture of the Trike is attached as an appendix to this opinion.

[2] The forks and front wheel had been removed from the Trike before it was stolen. In calculating the cost of constructing the Trike, the victim excluded the cost of those parts.

[3] Defendant argued at the restitution hearing that he had merely left the Trike unprotected and that someone else had cut it up. To the extent that the point matters, the evidence at the restitution hearing—particularly, the acetylene torch found in defendant's vehicle—permitted the trial court to find that defendant was the one who cut up the Trike.

and there's a Blue Book [for it], and so'—so they h[agg]led with me. Really unsatisfacturally [*sic*], so to speak."[4] No other evidence was offered at the restitution hearing regarding the value of the Trike.

In closing argument at the restitution hearing, defense counsel did not dispute that the Trike was a one-of-a-kind vehicle. Indeed, she acknowledged that "we can't really Blue Book this motorcycle because it's unique." Defense counsel observed, however, that the value of the vehicle and the cost of the parts were not necessarily equal. She noted that, if she put new tires on her truck, the value of her truck would not increase by the amount she paid for the tires.[5] She asserted that "insurance companies are * * * the experts in this matter," and she contended that the trial court should accept the amount that the insurance company had paid the victim for the Trike as its market value at the time and place that it was stolen.

The state responded that "[t]here's no authority whatsoever that what the insurance company says that they'll pay is the value of the stolen property in this particular case." The state contended, and defendant did not dispute, that the motorcycle was a "show vehicle, primarily trailered to different locations. And it was in mint condition." The state argued that, because the Trike was not "something you can just readily buy," the cost of building the Trike was the best measure of its value at the time of the theft. The state noted that the victim had testified that he had put over $100,000 into building the Trike and that that figure, reduced by the value of the recovered parts and presumably other factors, supported a restitution award of $82,000.[6]

---

[4] The statement quoted above is the only description in the record of how the insurance company arrived at the amount it was willing to reimburse the victim for his loss.

[5] Beyond that, defense counsel made no other argument against using the cost to build the Trike as a basis for determining its market value.

[6] Other than noting that the $100,000 estimated cost had been reduced by the value of the recovered parts, the state did not explain why it had asked for $82,000 in restitution. It noted that Rentfrow, the person who had taken the Trike initially, had been ordered to pay $82,000 in restitution in a separate criminal proceeding. Apparently, as a result of deductions made in that proceeding, the state had arrived at $82,000 as the value of the loss. The state noted that, if the court awarded restitution, defendant and Rentfrow would be jointly and severally liable for the amount that was owed.

In considering whether to award restitution, the court initially found that defendant had engaged in criminal activities that had caused the victim economic damages. It then turned to the amount of economic damages that should be awarded. The court noted that, if it were dealing with a standard model vehicle, it would agree with defendant that "the insurance company's value should be considered in deciding what the fair market value of the *** bike is." And it also agreed that, as a general proposition, the sum of the parts can exceed the value of a completed vehicle. The court reasoned, however, that "this is a different kind of animal. This is a very unique thing. This is a custom bike. It is not something that there was a ready market for. It's one-of-a-kind." The court accordingly "reject[ed] the Defense's argument that the economic damages should be limited to the market value of the completed vehicle," measured by the amount that the insurance company had paid the victim. The court found that the cost of the vehicle, measured by the cost of the parts and the labor used to construct it, provided a more accurate measure of its value at the time and place that it was stolen. It accordingly ordered defendant to pay the victim $82,000 in restitution. The court made the obligation joint and several with Rentfrow's obligation, established in a separate criminal proceeding, to pay the same amount of restitution.

The trial court's reasoning consisted of two steps. First, the trial court found that, because the Trike was a one-of-a-kind vehicle, there was no "market" for it and thus no Blue Book value or comparable sales that would establish its value at the time of the theft. Second, as between the two alternative methods of establishing the Trike's value that the parties proposed, the court rejected defendant's argument that it should adopt the amount that the insurance company had reimbursed the victim and relied instead on the cost that the victim testified that he had incurred in constructing the Trike ($100,000), discounted by $18,000. On appeal, defendant challenges each of those steps, and he adds a third issue that he did not raise below. He contends that the trial court should have subtracted some of the costs listed on the receipts that the victim submitted. We consider each of those issues in turn.

Defendant does not dispute that the trial court properly awarded the victim the "economic damages" that he sustained as a result of defendant's theft; that is, defendant does not dispute on appeal that his theft caused the victim's economic loss. *See State v. Islam*, 359 Or 796, 798, 377 P3d 533 (2016) (defining when restitution may be awarded). And he recognizes that the amount of economic damages that the victim could recover as a result of the theft is measured by the amount of damages that would be recoverable in a civil action for conversion. *See State v. Rosette*, 289 Or App 581, 588-89, 410 P3d 362 (2017) (explaining that conversion is the comparable civil action to determine the amount of restitution for the crime of theft). Finally, as both defendant and the state recognize, "'the measure of damages for the conversion of personal property is the reasonable market value of the goods converted at the time and place of conversion.'" *Hayes Oyster Co. v. Dulcich*, 170 Or App 219, 226, 12 P3d 507 (2000) (quoting *Hall v. Work*, 223 Or 347, 357, 354 P2d 837 (1960)).

Ordinarily, the "reasonable market value" of personal property is the market price. *See id.* at 229 (upholding the trial court's factual finding that there was a market for unseeded oyster shells that precluded consideration of alternative methods of valuing the shell). If, however, there is no market for the converted property, then the trier of fact may consider other methods of determining market value. *See id.* at 228 (explaining that "a party may always prove that there is no market for property * * * as a precondition to offering alternative methods of valuation").[7] In this case, the trial court found that there was no "market" for the Trike, and there is evidence in the record to support that finding. *See id.* at 229 (upholding the trial court's finding that there was a market for unseeded oyster shell because it was supported by evidence in the record). Indeed, defendant admitted in closing argument that "we can't really Blue Book this motorcycle because it's unique."

---

[7] A trial court also may consider alternative methods of valuation if the converted property consists of personal effects, such as household furniture. *See Hall*, 223 Or at 361-62. That is true even if there is a market for used household furniture. The state does not contend in this case that the Trike is a "personal effect." Rather, it relies on evidence in the record that permitted the trial court to find that there was no market for the Trike.

It follows that, on this record, the trial court correctly looked, not to evidence of comparable sales, but to other methods of valuation to determine the Trike's market value. On that point, defendant relied on the amount that the insurance company paid the victim for the Trike as, in effect, an expert opinion on its market value. As the trial court noted, however, although an insurance company's offer on a standard model car could provide a reliable estimate of its market value in some circumstances, an insurer's offer on a one-of-a-kind vehicle like the victim's Trike stands on a different footing. That is particularly true in this case, where there is no information on the policy terms or how the insurance company arrived at the value reflected in its offer for this one-of-a-kind vehicle.

In determining the market value of unique property, where no comparable sales or "market price" exists, trial courts may consider replacement cost, discounted for depreciation. *See* Dan B. Dobbs, 1 *Dobbs Law of Remedies* § 5.16(3), 907 (2d ed 1993) (explaining that replacement cost, discounted for depreciation, is an appropriate consideration in determining the market value of converted personal property when no "market price" exists); *cf. Dept. of Rev. v. Rivers Edge Investments, LLC*, 359 Or 822, 828, 377 P3d 540 (2016) (explaining that in determining the market value of unique real property, trial courts may consider cost and the property's income producing potential). Given that methodology, we cannot say that the trial court erred in relying on the original cost of building the Trike to determine its market value at the time and place of the theft.

To be sure, when a court relies on cost (either original or replacement) to determine a property's market value, adjustments normally will be required to take account for such things as the property's condition at the time of the theft. Defendant, however, does not dispute that the Trike was in mint condition, and he has not argued, either at trial or on appeal, that the cost of the bike should have been adjusted to take depreciation into account. The only comparable argument that defendant raises on appeal is that some of the costs reflected in the receipts the victim submitted should not have been considered in determining the cost of constructing the Trike. Specifically, defendant notes

on appeal that, in addition to including the cost of the parts used to construct the Trike, the receipts before the trial court also included the cost of maintenance—oil changes and the like. He contends that those amounts should not have been considered in determining the Trike's market value.

Defendant did not raise that issue below and may not raise it for the first time on appeal. *See State v. Moles*, 295 Or App 1, 4, 433 P3d 497 (2018) (generic objection to an instruction at trial did not preserve the more specific objection that the defendant later raised on appeal). Moreover, we note that the trial court did not award the victim the full amount of the costs that he incurred in building the Trike. Rather, the victim requested and received only $82,000 in restitution; specifically, the victim reduced the estimated $100,000 cost of constructing the vehicle by $18,000 when he sought restitution in this case. The record does not reflect all the reasons for that reduction. Although the state observed that the victim had reduced his request to reflect the value of the recovered parts, which were valued at approximately $8,000, that still leaves an additional reduction of approximately $10,000.[8]

As noted above, the $82,000 request for restitution mirrored the amount of restitution awarded in a separate criminal proceeding involving Rentfrow. It may be that any and all questions regarding appropriate adjustments to the $100,000 cost of constructing the Trike were addressed in Rentfrow's separate restitution hearing and led to a restitution award of $82,000. In any event, in the absence of any objection in this case that the $82,000 restitution request improperly included specific costs, such as oil changes and the like, we conclude defendant failed to preserve that issue. For the reasons stated above, we affirm the trial court's judgment.

Affirmed.

---

[8] According to the record, the $100,000 estimated cost did not include the value of the front forks and wheel, which had been removed before the Trike was stolen. Moreover, there is no indication that the $18,000 reduction included the amount paid by the insurance company.

## APPENDIX

